**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TIMOTHY HOPKINS,

                    Plaintiff,

v.                                                    Case No. 05-71802
                                                      HON. MARIANNE O. BATTANI
GENERAL MOTORS, a Michigan
corporation,

                    Defendant.
_____/


# OPINION AND ORDER GRANTING DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT

        Before the Court is Defendant's Motion for Summary Judgment (Doc. No. 26).
The Court heard oral argument on November 29, 2006.  At the conclusion of the
hearing, the Court took this matter under advisement.  For the reasons that follow, the
Court **GRANTS** Defendant's motion.

## I.  STATEMENT OF FACTS

        Plaintiff, Timothy Hopkins, filed suit against his employer, Defendant, General
Motors Corporation ("GM"), claiming Defendant discriminated against Plaintiff based on
Plaintiff's weight in violation of the American with Disabilities Act ("ADA"), 42 U.S.C.A. §
12101 et seq., the Persons With Disabilities Civil Rights Act ("PWDCRA"),
MICH.COMP.LAWS § 37.1101 et seq., and the Elliott-Larsen Civil Rights Act,
MICH.COMP.LAWS ("ELCRA") § 37.2202(1)(a) .  Plaintiff began employment with
Defendant in 1977.  During the course of his employment, Plaintiff began driving a truck,
using a forklift to load and unload materials within the plant.  Plaintiff maintained this
position until the early 1990s, when Plaintiff could no longer get up into the truck due to

his weight, which was over 600 pounds.  To accommodate Plaintiff's weight, Defendant moved Plaintiff into Post-Line Production.

From 1992 through 1996, Plaintiff remained in Post-Line Production, excluding a period where due to a broken ankle, Plaintiff went on medical leave.  By 1997, Plaintiff had multiple work restrictions, despite his placement in an easier job.  Eventually management deemed Plaintiff's weight of 660 pounds a safety hazard.  Plaintiff had trouble walking and required the aid of a motorized vehicle to move throughout the plant.  According to Plaintiff, he was written up repeatedly because of hygiene issues arising from his weight.  Hopkins' Dep. at 163.  After Defendant suspended Plaintiff for 30 days because of the hygiene complaints, Plaintiff applied for disability retirement.  In 1997, GM doctors found the Plaintiff qualified for total and permanent disability ("TPD") based on his weight.

In November 2003, Plaintiff who weighed 677 pounds, underwent gastric bypass surgery.  In 2004, Hopkins sought to return to work.  Consequently, he consulted his personal physicians, who determined "[Plaintiff] was fit for duty with no restrictions." See Pl.'s Ex. 17, releasing Plaintiff for work on December 2, 2004; Pl.'s Ex. 18, release to full duty.  Plaintiff also consulted his Union Representative, Jeff Buckley.  The policy governing return from a TPD, as stated in the in the 2003 Supplemental Agreement, is as follows:

> 1.   The retiree will provide medical evidence to the Plant Medical Director, satisfactory to the Corporation, that supports that such retiree is no longer T&PD. The information will include, among other relevant information, a narrative report that details what has improved and why the condition under which such retiree was determined to be T&PD no longer exists or no longer disables the retiree. Documentation will include appropriate lab reports and/or test results.

2

2.  If necessary, the Plant Medical Director may examine the retiree to determine if the retiree has recovered.

3.  If the Plant Medical Director determines the retiree has recovered. . .and the corporation agrees, . . .retirement status can be cancelled.

4.  If the Plant Medical Director determines the retiree has not recovered and should remain on T&PD retirement, the retiree will continue T&PD status under the Pension Plan. . . .

5.  If the retiree disagrees, the retiree may contact the UBR.  If the UBR disagrees. . .the UBR will forward the case. . .to the. . .UAW-GM Department. . .GM EB Staff will provide the International Representative with the Corporate Medical Director's decision of why the retiree has not recovered and is not able to engage in regular employment on a job within the plant.  If the International Representative disagrees with the determination of the Corporation, the International Representative. . .may agree to schedule an exam with an impartial specialist physician selected by the Plant Medical Director. . .The impartial clinic or physician will determine whether the retiree has recovered and is able to engage in regular employment on a job within the plant.  The decision of the impartial clinic or physician is final and binding on the retiree, the Union, and the Corporation. . . .

Pl.'s Ex. 20, p. 102.

In late 2004, Plaintiff, who weighed 334 pounds, scheduled an appointment with the Plant Medical Director, Dr. Husan Rahman.  Dr. Rahman saw Plaintiff on November 29, 2004.  During the examination, Plaintiff related his situation to the doctor, informing her that following TP&D retirement due to his weight in 1996, Plaintiff had lost over 300 pounds and wanted to return to work.  Plaintiff showed the doctor before and after pictures of himself.  He also provided notes from his bypass surgeon and plastic surgeon clearing him for work.  Dr. Rahman checked Hopkins' vital signs and his gastric bypass scarring.  She had Plaintiff perform a straight leg raise test and walk heel to toe.

Plaintiff claims Dr. Rahman "communicated to him that he appeared to be physically capable of working, that she saw no problem with him returning to work," and that he was "apparently healthy."  Hopkins' Dep. at 72-73.  Hopkins claims that Dr. Rahman told him that although she had to speak with appropriate personnel, she felt he could return to work.  Id.  Plaintiff left the examination thinking his return to work would be immediate; however, he concedes that this was only his impression.  Id.

In contrast to Plaintiff's recollection, Dr. Rahman's notes indicate that she informed Plaintiff that she would "have a meeting with all the people who are involved in this," and then she would be able to give him an "answer" to his request to return to work.  Def.'s Ex. C.  Following the exam, Dr. Rahman spoke to a nurse, Linda Nealis, who was familiar with the return from TPD retirement process.  Nealis informed Dr. Rahman that she was not suppose to examine Plaintiff, but because she had "she should go ahead and make her assessment."  Id.  Dr. Rahman found Plaintiff unfit to return to work based on her concerns that the drop foot would be a hazard in heavy truck lift traffic and that Plaintiff was not in good enough condition, given the demands of the job.  Id.

Plaintiff appealed the decision, and was subsequently examined by an independent medical exam on April 25, 2005.  Dr. Jamal Hammoud described Hopkins "as 'moderately obese,' [noting that he] uses a cane when he walks…[and] has a brace on his right knee."  Pl.'s Ex. 37.  Dr. Hammoud reported, "I do not believe he can do the [fork lift] job that was described by the Plant Doctor."  Id.  Dr. Hammoud described Plaintiff as "weak," noting "general weakness in the upper and lower extremities."  Id.  Dr. Hammoud believed Plaintiff could not fulfill the requirements of the truck driving

4

position, but opined that "he could do an easier job with no lifting more than 10 pounds and he should probably try to first work 4 hours a day." Id. at 10. Finally, Dr. Hammoud suggested Plaintiff be reevaluated in 6 months. Id.

Plaintiff claims that Dr. Hammoud informed him of the decision, which, according to the union representative, violates the appeal process as the International Union had the responsibility of informing Plaintiff. Buckley Dep. at 15, 16, 18. Hopkins subsequently filed a challenge to Dr. Hammoud's decision, challenging its impartiality due to Dr. Hammoud's communication with Dr. Rahman.

Although not authorized under the Supplemental Agreement, the parties agreed to a third examination of Plaintiff, which took place in July 2005. Dr. Clifford Buchman examined Plaintiff, who weighed 240 pounds at that time. Dr. Buchman found Plaintiff "could return to work without restrictions." Pl.'s Ex. 39. As a result, on September 1, 2005, almost one year after his initial exam by Dr. Rahman, Plaintiff returned to work at as a post-line parts handler. After two months, Plaintiff returned to his job as a fork truck operator.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon
> motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case,
> and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact.  See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002).  "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court--that there is an absence of evidence to  support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties."

6

Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted) (quoting

Black's Law Dictionary 881 (6th ed. 1979)).  To create a genuine issue of material fact,

the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the
> nonmoving party for a jury to return a verdict for that party.  If the
> [nonmovant's] evidence is merely colorable, or is not significantly
> probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the

'record taken as a whole could not lead a rational trier of fact to find for the non-moving

party.'" Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir.

2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986)).  The evidence itself need not be the sort admissible at trial.  Tinsley v. General

Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).  However, the evidence must be more

than the nonmovant's own pleadings and affidavits.  Smith v. Campbell, 250 F.3d 1032,

1036 (6th Cir. 2001).  The mere existence of a scintilla of evidence in support of the

non-movant is not sufficient; there must be sufficient evidence upon which a jury could

reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

## III. ANALYSIS

### A. Federal claim

The parties dispute whether Plaintiff can establish that Defendant discriminated

against him based upon a perceived disability or prior record of disability.  Here, Plaintiff

admits that no one, including Dr. Rahman, ever said that Plaintiff could not perform a

job based upon his weight, or that he was limited in performing a job or class of jobs

because of his weight.  This admission is inconsequential.  In analyzing claims brought

7

under the ADA, when a plaintiff lacks direct evidence of discrimination, courts employ the analytical framework set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973).

First, the plaintiff must establish a prima facie case of disability discrimination. The burden of production then shifts to the defendant to articulate some "legitimate, nondiscriminatory reason" for its actions against the plaintiff.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1980).  The defendant need only present evidence that raises a genuine issue of material fact; it is not necessary to prove that the proffered reasons actually motivated the defendant's action.  Id. at 254-55.  If the defendant meets this burden, the "prima facie case is rebutted." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993) (citing Burdine, 450 U.S. at 255).  The plaintiff then must demonstrate by a preponderance of the evidence that he has been the victim of discrimination.  Burdine, 450 U.S. at 256.  Plaintiff always retains the "ultimate burden of persuasion." St. Mary's, 509 U.S. at 511.

## 1.  Prima facie case

To state a claim of disability discrimination under the ADA, a plaintiff must show that he is a disabled person within the meaning of the Act; that he is qualified with or without a reasonable accommodation to perform the essential functions of his job; and that he was discriminated against because of his disability.  42 U.S.C. §§ 12111(8), 12112(a).  McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997) (citing Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1179 (6th Cir. 1996)).

Defendant maintains that Plaintiff is unable to satisfy his burden to show that he is disabled within the meaning of the ADA, or that Defendant discriminated against him because of his disability.  The Court examines each argument below.

8

**a.  Is Plaintiff disabled?**

Under the statute, a person is disabled if he has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual;" or "has a record of such impairment" or "does not have an impairment, but is regarded as having one."  42 U.S.C. § 12102(2).   Here, Plaintiff argues that he can succeed on a claim under the second and third prongs of the test.  Accordingly, the Court directs its attention to whether Plaintiff meets either prong of the test.

*I.  Record of impairment*

An individual has a record of impairment if he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k).   In this case it is clear that if obesity qualifies as a physical impairment, Plaintiff can satisfy the definition.  The Court therefore rejects Defendant's argument that Plaintiff has no record of impairment because his medical records were not in front of Dr. Rahman when she examined Plaintiff.

There is no dispute that Plaintiff was attempting to return from a permanent and total disability retirement at the time he was examined.  There is no dispute that Plaintiff informed Dr. Rahman of the circumstances of his disability retirement during the course of the exam.  She certainly had access to Hopkins' records; and his obesity was documented as early as 1989.  See Pl.'s Ex. 8.  These facts satisfy Plaintiff's burden to show the record of impairment prong under the ADA.  Accordingly, the Court does not address Plaintiff's alternative argument, that GM regarded him as having a disability.

*ii.  Does obesity qualify under the ADA?*

9

The next hurdle Plaintiff must overcome is showing that his condition is a disability for purposes of the ADA.   The Sixth Circuit, in reviewing the governing regulations, recently held that in order to constitute an ADA impairment a person's obesity, even morbid obesity, must be the result of a physiological condition.  EEOC v. Watkins Motor Lines, Inc., 463 F.3d 436 (6th Cir. 2006).  In reaching this holding, the Watkins Court reviewed the federal regulations, which define "physical or mental impairment" as follows:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (2005).  The appendix provides additional guidance.

> It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight, or muscle tone that are within "normal" range and are not the result of a physiological disorder.

29 C.F.R. § 1630.2(h) (App.2005) (emphasis added). Thus, "physical characteristics that are 'not the result of a physiological disorder' are not considered 'impairments' for the purposes of determining either actual or perceived disability." Andrews v. State of Ohio, 104 F.3d 803, 808 (6th Cir.1997).

To combat the Watkins decision, which was issued after Plaintiff filed his suit, Plaintiff offers letters from his treating physicians.  The first opines that Plaintiff "was

10

genetically predispositioned to become morbidly obese." Pl.'s Ex. 41. The second likewise writes that Plaintiff's super-morbid obesity was caused by familial and genetically acquired predispositions." Pl.'s Ex. 42.

Although it is unclear whether these opinions meet the standard, compare Andrews v. State of Ohio, 104 F.3d 803 (6th Cir. 1997) (finding a suggested cause meeting the requirement was glandular); Cook v. State of R.I., 10 F.3d 17 (1st Cir. 1993) (allowing an obesity claim to go to the jury in light of testimony that the cause was a dysfunction of the metabolic system and the neurological appetite suppressing signal system), the Court assumes for purposes of this motion that the opinions satisfy Plaintiff's burden and assesses the merits of each parties' position relative to the third prong of Plaintiff's prima facie case.

### b. Was Plaintiff treated differently?

To meet his burden to show Defendant discriminated against him because of his disability, Hopkins need only show that he was treated differently that other similarly situated employees when GM denied him reinstatement in November 2004. To meet this burden Plaintiff points to Dr. Rahman's conduct. Plaintiff asserts that she did not follow the stated policy when she examined him and decided whether he could return to work. First, although Plaintiff passed every test given, Dr. Rahman found him unfit. Second, Dr. Rahman never referred him to the ADAPT (Accommodating Disabled People in Transition) team. In addition to Dr. Rahman's unsupported judgment that Plaintiff was unfit, Plaintiff contends that other employees with similar limitations were working.

*I. ADAPT referral*

11

ADAPT applies by its own terms to employees on temporary disability. The program is described as "designed to enable employees with disabilities to be retained at work or returned to work from a sick leave or worker's compensation leave. . . ." Pl.'s Ex. 23. Plaintiff was neither an employee, nor returning from sick or worker's compensation leave; he was on a total and permanent disability retirement. In addition, Dr. Rahman testified that she did not make a referral to ADAPT when she found an employee unable to return to work at all, only when an employee was returning to work with restrictions. Therefore, Dr. Rahman's failure to refer Plaintiff or identify any specific restrictions applicable to Plaintiff merely reflects her opinion that Plaintiff should not return to work. The absence of restrictions is consistent with her practice. See Rahman's Dep. at 31-50. Plaintiff has advanced no evidence that controverts her stated practice.

### ii.  Availability of accommodations

According to Plaintiff, numerous employees were given accommodations. See Pl.'s Ex. 5. Nevertheless, Defendant did not allow Plaintiff to return with the restrictions suggested by Dr. Hammoud--a ten-pound lifting restriction and a four-hour work day.

At the outset, the Court observes that Dr. Hammoud found Plaintiff unable to return to his position. Second, the Court finds that Plaintiff has not compared himself to employees that were similarly-situated. Although a plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated;" he and the comparable must be similar in all relevant aspects. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). After careful scrutiny of the information presented, the Court finds that

12

Hopkins has not made this showing.  Although one employee in the post-line production had a ten-pound lifting requirement, that employee worked an eight-hour day.  See Defendant's Exhibit G.  Therefore, Plaintiff cannot show that a similarly-situated employee was treated better.  Moreover, Plaintiff cannot show that he was treated differently than any retiree returning to work after a total and permanent disability retirement.

Even if Hopkins could show that he was treated differently, the Court finds he cannot satisfy his burden under McDonnell Douglas.  Although a presumption of discrimination arises once the Plaintiff has established a prima facie case under the ADA, here, Defendant has rebutted that presumption by introducing "evidence of a legitimate, nondiscriminatory reason for its challenged actions."  Gavalik v. Continental Can Co., 812 F.2d 834, 853 (3d Cir. 1987).   Dr. Rahman indicated that Plaintiff's drop foot and fitness concerns prevented Plaintiff from returning to work.  Therefore, it is incumbent upon Plaintiff to show this reason is a mere pretext for discrimination.

### 2.  Pretext

To demonstrate pretext, Hopkins must prove 'that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate" Dr. Rahman's failure to return Plaintiff to work, or, "if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge.'"  Hoskins v. Oakland County Sheriff's Dept., 227 F.3d 719, 731 (quoting Warfield v. Lebanon Corr. Inst., 181 F.3d 723, 729 (6th Cir. 1999)).  Plaintiff maintains that Defendant's failure to return him to work is not grounded in fact because he passed fourteen objective tests and had a normal exam.  Further, discriminatory intent can be inferred by Dr. Rahman's behavior

13

during the exam, her failure to examine his leg, and her exaggeration of his condition during her deposition testimony as revealed through her comment that no one with a limp could work at the plant. In addition, discriminatory motive is revealed by Dr. Rahman's interference in Plaintiff's subsequent evaluation by Dr. Hammoud, her failure to refer him to ADAPT, and her failure to identify any specific limitations or restrictions before classifying him as unfit to work. Finally, Hopkins argues that his drop foot condition did not prompt Dr. Rahman's decision to deny his request to return to work, his prior weight condition did.  As support of his contention, Plaintiff cites Dr. Rahman's admission in her deposition that Plaintiff's weight was a concern, that she was well aware that he had been 600 pounds, and her description of Plaintiff as "very huge." Def.'s Ex. D.

Plaintiff overstates the import of his evidence.  First, the fact that Plaintiff had a normal exam does not undermine Dr. Rahman's stated concerns.  She noted that he walked with a limp and that he needed conditioning exercises because he had not worked since March of 1997.  Id.  Plaintiff does not contest the factual accuracy of these two observations.  Further, Dr. Rahman testified that she focuses on the precipitating cause of the medical leave, see Rahman Dep. at 36, so her concern with fitness is consistent with her stated practice.  It is undisputed that when Plaintiff was first examined, he had not engaged in any sustained physical activity (because of his weight and his surgery) for a long period of time.  His exam six-months later by Dr. Hammoud indicated general weakness in the upper and lower extremities.  Pl.'s Ex. 37.  Dr. Rahman's concerns about Plaintiff's fitness level clearly were legitimate, as were her concerns about Plaintiff' foot drop. Plaintiff did not wear his foot brace to his

14

examination.  Plaintiff was allowed to return to work, after losing an additional hundred pounds and continuing a sustained physical regimen.  Once the conditions Dr. Rahman found disabling were resolved, Plaintiff was returned to work.

Despite Plaintiff's desire to draw an inference that Dr. Rahman interfered in Plaintiff's second evaluation, the record does not support his position.  Plaintiff draws this inference based upon Dr. Hammoud's inclusion in his evaluation that Plaintiff could not do "the job that was described by the Plant Doctor."  Pl.'s Ex. 37.  Nonetheless, both Drs. Hammoud and Rahman deny that Dr. Rahman shared her opinion about Plaintiff's fitness for work with Dr. Hammoud or in any way sought to determine the outcome of the examination.  See Rahman Dep. at 82, (denying "discussing substantive issues prior to his [Hammoud's] medical determination"); Hammoud Dep. at 57.  In light of their testimony, no inference of interference arises.

In sum, Plaintiff has no evidence to suggest the real reason he was not returned to work was discrimination.  To the contrary, the facts show that the concerns noted by Dr. Rahman were subsequently found by Dr. Hammoud, who advised Plaintiff to return in six months.  Eventually those concerns were addressed by the passage of time.  Plaintiff continued to lose weight and continued to exercise and increase his fitness level.  At the time of his third medical evaluation, the conditioning concerns were resolved, and Plaintiff wore his foot brace to this examination.  Plaintiff was not returned to work in November 2004, because Dr. Rahman believed him to be unfit.

Because GM proffered a legitimate nondiscriminatory reason for not returning him to work, and Plaintiff has no evidence that the reason was merely a pretext for discrimination, GM is entitled to summary judgment on Plaintiff's ADA claim.

15

### B. State law claims

#### 1. PWDCRA

Plaintiff's claim under the Persons With Disabilities Civil Rights Act ("PWDCRA") invokes analysis under the same standards as the ADA claim. Fritz v. Mascotech Automotive Sys. Group, Inc., 914 F.Supp. 1481, 1491 (E.D. Mich. 1996); Chmielewski v. Xermac, Inc., 508 N.W.2d 817, 821 (1998). Because the Michigan PWDCRA is substantially identical to the ADA, Michigan courts rely on ADA decisions in resolving claims under the state law. See Smith v. Chrysler Corp., 155 F.3d 799, 804 (6th Cir.1998). Thus, the "resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." Cotter v. Ajilon Svcs., Inc., 287 F.3d 593, 597 (6th Cir. 2002); Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 n. 3 (6th Cir. 1998)(citing Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1178 n. 3 (6th Cir. 1996), and Ashworth v. Jefferson Screw Products, Inc., 440 N.W.2d 101, 104-05 (Mich.Ct.App. 1989)).

Here, the parties have not advanced any grounds for distinguishing the federal and state claim. Accordingly, the Court's conclusion as to the viability of the federal discrimination claim likewise applies to the state discrimination claim. Plaintiff failed to produce evidence sufficient to create a genuine issue of material fact as to whether Defendant treated Plaintiff differently than a similarly-situated nonprotected person or that its articulated reason for terminating Plaintiff was pretextual. Accordingly, Defendant is entitled to summary judgment on this claim as well.

#### 2. Elliott Larsen

16

The Elliott Larsen Civil Rights Act prohibits employment decisions based on weight.  MICH.COMP.LAWS § 37.2202(1)(a).  Plaintiff can proceed with a claim by showing intentional discrimination or disparate treatment.  A plaintiff may establish a prima facie case of discrimination by showing that he was:  (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct.  Town v Michigan Bell Telephone Co., 568 N.W.2d 64 (1997), citing McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973).  If the plaintiff establishes a prima facie case, a presumption of discrimination arises that the defendant may rebut by articulating a legitimate, nondiscriminatory reason for the employment decision.  Town, supra.  If the employer rebuts the presumption of discrimination, the plaintiff must then raise a triable issue that the stated reason for the adverse employment decision was merely pretext for discriminatory animus.  Id.

In analyzing the claim, the Court is mindful that weight need not be the only reason or the main reason for the employer's conduct, just one of the reasons.  The term "weight" is not defined in the statute; however, the purpose of the Act is to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases. See Malan v Gen'l Dynamics Land Systems, Inc, 538 N.W.2d 76 (1995).

Here, Plaintiff proceeds on a claim of disparate treatment.  Again, the Court relies on the analysis of the federal claim to conclude that Plaintiff cannot make a prima facie case.  Plaintiff cannot raise a genuine issue of material fact because he has no evidence that others outside the protected class were treated differently.  Accordingly, his claim fails as a matter of law.

17

## IV.  CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendant's motion for summary judgment.

**IT IS SO ORDERED**.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: February 28, 2007

## CERTIFICATE OF SERVICE

A copy of this Order was e-filed and/or mailed to Megan Bonnanni and David M. Davis on this date.

s/Bernadette M. Thebolt
Deputy Clerk